William D. Hyslop
United States Attorney
Eastern District of Washington
Timothy J. Ohms
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | Case No. 2:18-CR-00105-SAB |
| vs. | |
| AMANDA GAYLE FERGUSON, | United States' Sentencing Memorandum |
| Defendant. | |

Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, and Timothy J. Ohms, Assistant United States Attorney, submits herewith its Sentencing Memorandum.

The Defendant's advisory Guideline range is 130 to 162 months based on an adjusted offense level of 27 and a Criminal History Category of VI (with 21 criminal history points). PSR ¶ 49, 126. The maximum penalty for the offenses in this case is 10 years. ECF No. 3. Thus, the Court would have to impose consecutive sentences in order to sentence the Defendant within the Guideline range. The plea agreement dismissed Count 8, which carried a mandatory minimum penalty of 5 years and a higher maximum penalty of 40 years. ECF Nos. 3, 40 at 10. The dismissal of Counts 5 and 8 were designed in part to prevent the

United States Sentencing Memorandum – 1

loss of the Defendant's widow's pension. Pursuant to the plea agreement, the government is bound to recommend a sentence within a range of 92 to 115 months. ECF No. 40 at 12. The Defendant was permitted to recommend a sentence as low as 70 months, which the Defendant has done through her Sentencing Memorandum filed on October 25, 2019. ECF Nos. 40, 57.

The government does not believe that a 70-month sentence (five years and 10 months) is sufficient to achieve the goals set forth in 18 U.S.C. § 3553(a). The government is recommending a sentence of 96 months (8 years) as sufficient but not greater than necessary to achieve those goals.

The defense sentencing argument emphasizes the need for drug treatment and explains the Defendant's criminal conduct as a reaction to the loss of her husband in 2007 and the negative influences of subsequent relationships. Clearly, the Defendant has experienced tragic and profound loss, but that loss neither justifies nor fully explains her subsequent criminal conduct.

The PSR reflects that the Defendant began abusing controlled substances early in life. Her abuse of alcohol led to her first arrest for DUI at the age of 19. PSR ¶ 55. The Defendant was using controlled substances by the age of 14. PSR ¶ 153. Although she appears to have had access to drug rehabilitation programs from an early age, these were not successful. PSR ¶ 153. She also appears to have had the benefit of a loving and supportive relationship from her father and stepmother. PSR ¶ 152. It is not uncommon for persons who abuse drugs to become involved in criminal conduct and in unhealthy relationships with others who are also involved in the use or distribution of drugs. Indeed, the correlation between drug use and an increased propensity to commit crime is recognized by the Sentencing Guidelines, which caution against downward departures based on drug or alcohol dependence or abuse:

> Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an increased propensity to commit crime.

USSG §5H1.4. Some of the reasons for this correlation are exemplified in the present case. The Defendant has a significant criminal history involving identity theft and other property crimes. PSR ¶¶ 65, 82, 84, 85, 89, 94, 98, 105. Indeed the Defendant has 19 criminal history points derived from prior convictions and 2 additional points for recency. PSR ¶¶ 124-126. This criminal conducted helped support the Defendant's abuse of controlled substances. Similarly, the Defendant maintained several relationships, despite allegations of abuse, because they provided her with access to controlled substances. PSR ¶¶ 155, 161. Based on the Defendant's personal history as outlined in the PSR, the Defendant's abuse of drugs and the collateral consequences of that drug abuse prevented her from maintaining potentially more productive relationships with family members, including her own children. PSR ¶¶ 151, 156, 158. These circumstances are tragic, but a history of criminal conduct and destructive relationships in order maintain one's access to drugs is not mitigating.

      Clearly, the Defendant is in need of a prolonged period of drug treatment. Without successful long-term treatment, she will present a continued danger to the community through continued criminal conduct. A longer sentence in this case may provide greater opportunities for treatment. The potentially productive relationship between custody and treatment is highlighted in one of the letters submitted by the Defendant, in which the author noted:

> She does well when she's in jail. I think it's because of the controlled environment. Since I've known her she has completed many self-help programs as well as completed jail sentences. The problem is when she get[s] out.

ECF No. 53-2 (corrected as to form).

United States Sentencing Memorandum – 3

As with much of the Defendant's past criminal conduct, the offense conduct in the present case appears to have been motivated by the Defendant's desire to both support her drug use and to maintain her access to drugs. The Defendant was not forced into this conduct or manipulated by others. Indeed, following the arrest of the Defendant's partner, N.R., the Defendant called the confidential informant (CI) working with the ATF to explain that N.R. had been arrested but that she would be able to continue without him. Later that day, September 19, 2016, the Defendant, accompanied by another woman, met with the CI. The CI was accompanied by an ATF agent working in an undercover capacity (UC), and introduced the UC to the Defendant. The UC stepped in for the CI for all future transactions, which were also audio and video recorded. Thus, the strength of the evidence for this and all future transactions was high. During that first meeting, the Defendant sold the UC 3.96 grams of methamphetamine. (Count 5). The woman accompanying the Defendant offered to sell an airsoft gun, which the UC declined to purchase. Nevertheless, the Defendant expressed an awareness of the prior transactions involving N.R. and assured the UC that she would be able to continue them.

Thereafter, on September 28, 2016, the Defendant and a person identified as "Bambi" attempted to sell the CI an AR-15 at the Northtown Mall. The Defendant arranged the transaction but backed out of it after she reported seeing flashing police lights in the area.

On October 6, 2016, the Defendant sold the UC a stolen Smith and Wesson .38 Special revolver in the parking lot of the Chinese Restaurant on North Division. (Counts 6, 7). During the transaction, the Defendant indicated that she could obtain methamphetamine for the UC and additional "pen" guns like the cigar-size improvised shotgun sold by N.R. on August 1, 2016. (Counts 2, 3, 4).

On October 7, 2016, following the Defendant's offer to sell additional methamphetamine, the Defendant delivered approximately one ounce of methamphetamine to the UC. The transaction was a hand-to-hand delivery from the Defendant to the undercover ATF agent and was recorded. When the Defendant got into the UC's car, she pulled a clear plastic bag containing the methamphetamine from under her shirt. The UC weighed the bag on a portable scale. When she found that the bag weighed only 25.5 grams, the Defendant produced a second bag of methamphetamine and removed a portion of the methamphetamine to add to the bag being delivered to the UC. During the transaction, the Defendant showed the UC photographs of a disassembled tommy gun that she was also offering for sale.

The following day, October 8, 2016, the Defendant sent the UC a text message asking if she was interested in buying a sawed-off 12 gauge shotgun. The UC told the Defendant that she was out of town, and the Defendant agreed to hold the shotgun for a few days until the UC returned. On October 10, 2016, the Defendant met the UC at the same restaurant parking where they met on October 6, 2016. The Defendant delivered the shotgun, which was concealed in clothing. (Counts 9, 10). The UC paid the Defendant for the shotgun and paid her an additional fee for holding the shotgun for her. During the transaction, the Defendant indicated that she was able to provide additional firearms and methamphetamine.

A few days later, on October 13, 2016, the Defendant sent the UC a text message indicating that she had something that the UC was going to want and that she would have some additional "pen" guns soon. The UC called the Defendant and learned the "something" that she believed the UC would want was a "grenade." The Defendant indicated that the "grenade" was live and was for sale

United States Sentencing Memorandum – 5

for $175. To encourage the sale, the Defendant sent the UC photos of the "grenade" by text message. The UC met the Defendant in a restaurant parking lot. The UC brought the "grenade" into the UC's car in a blue and red zippered pouch. The UC confirmed that it was a military flash-bang grenade and placed in the trunk of her car. During the transaction, the Defendant told the UC that she could get more "grenades" and relayed that she had once sold "some Mexicans" a state trooper uniform for "a lot of money." She explained that she has access to these things "because I sell dope."

The offense conduct in this case is exceptional for offenses related to the possession of firearms. The seriousness of the conduct weighs in favor of a harsher sentence in order to ensure that the sentence reflects the nature and seriousness of the offense and the Defendant's extensive history of criminal conduct. A harsher sentence is also justified in order to avoid unwarranted sentencing disparities with persons who are similarly situated. Indeed, a person with much less criminal history (that is, 9 fewer criminal history points) would be facing the same Guideline range as the Defendant in this case. Finally, a harsher sentence is also merited to deter the Defendant from future criminal conduct, to promote respect for the law, to protect the community from future crimes by the Defendant, and to provide adequate time for drug treatment and rehabilitative vocational training while in custody.

The government is concerned that the Defendant still fails to fully grasp the seriousness of her conduct. In her written statement of elocution (ECF No. 54), the Defendant explained that she did not fully appreciate the seriousness of her conduct because she had grown up using firearms and viewed them more as "tools" then as weapons. This line of reasoning might have been more plausible if the Defendant had been selling hunting rifles, rather than a stolen handgun, a "pen"

gun designed to fire a shotgun shell, a sawed-off shotgun, and a "grenade." The transactions are all interspersed with the delivery of methamphetamine and offers to obtain additional methamphetamine and firearms, including additional "pen" guns and "grenades." No reasonable adult could fail to appreciate the seriousness of this conduct in today's world. The sentence imposed should help communicate that seriousness.

Finally, the government has considered mitigating circumstances in this case. This is a case in which all of the transactions with the Defendant involved an undercover agent and were fully recorded. Thus, the litigation risk of pursuing this matter to trial for the government was minimal. The Defendant was the one who initiated contact with the confidential informant following the arrest of N.R., and who continued to reach out for the UC with new offers of firearms and methamphetamine for sale. The plea agreement in this case was the result of prolonged negotiations with Defendant's counsel and prior counsel. The agreement reached resulted in the dismissal of the most serious drug charges, which preserved the Defendant's widow's pension and reduced the maximum penalty from 40 years to 10 years for each count. The advisory Guideline range of 130 to 162 months is not unreasonable in this case. The negotiated resolution that bound the government to recommend a sentence within the range of 92 to 115 months encompassed elements of a charge bargain and sentencing compromises that benefited the Defendant. The sentence recommended by the government of 96 months is almost three years below the low-end of the Guideline range.

The government believes that the Defendant has been treated fairly in this case, and that its recommendation of a sentence of 96 months is appropriate in light of the seriousness of the offense conduct, the Defendant's extensive criminal history, and the need to protect the community while providing long-term

United States Sentencing Memorandum – 7

treatment and vocational rehabilitation opportunities for the Defendant. The recommendation is further warranted to promote respect for the law, to deter future criminal conduct, and to avoid unwarranted sentencing disparities.

Dated November 1, 2019.

William D. Hyslop<br>
United States Attorney<br><br>
<u>s/ Timothy J. Ohms</u><br>
Timothy J. Ohms<br>
Assistant United States Attorney

## CERTIFICATE OF SERVICE

    I hereby certify that on November 1, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record.

<u>s/ Timothy J. Ohms</u><br>
Timothy J. Ohms<br>
Assistant United States Attorney